May it please the Court, my name is Georgia McMillan and I represent the defendant appellant. I am reserving one minute rebuttal time. Your Honor, this appeal comes from a ruling by Judge Malway, U.S. District Court, Hawaii, in which Judge Malway denied a motion to suppress evidence on the grounds that Mr. Martin consented to a search of his premises. This case stems from an incident that occurred on April 1, 2003. Apparently there was an altercation at Mr. Martin's home between his wife and another woman, and in order to break up this altercation that Mr. Martin did not appear to be a party in, he chose to get a shotgun and fire it through the roof of his garage. It did break up the altercation but caused some problems for Mr. Martin. Subsequently, the police arrived at his property on the Big Island of Hawaii to investigate this incident, and herein lies the problem with this appeal. Our side and the government have vastly different interpretations of the events that happened when the police arrived at Mr. Martin's home. We believe that Mr. Martin did not consent to the search of his home, and all the evidence in his statements that were gathered as a result of the police arriving at his home on April 1, 2003, should have been suppressed. This is Judge Fletcher. Judge Mollway concluded that he did consent. Why is Judge Mollway wrong? Judge Mollway is wrong because, in the first instance, we do not believe, or, excuse me, Your Honor, I'll put it a different way. We believe that Mr. Martin was in custody. And this was a hotly debated issue concerning this motion to suppress. Does Mollway and the government think he was in custody? We don't think he was. There are three underpinnings to the conclusion that he was not in custody. Let me interrupt for just a moment. If he was in custody, could he have still consented? Or would it have just been more difficult for him to consent, more difficult to show consent for the government? If he was in custody, he still could have consented. But the case law, Your Honor, that both parties briefed tell us that we need to go through these five factors. And no one factor is determinative, but rather it's looking at all the factors together. We do think the custody issue is quite important, Your Honor. As to that, when the police arrived – Could I – if you're moving from the custody, if I could ask about – this is Judge Ikuda, the custody issue. Yes. The case you cite to United States v. Woneka says that a defendant is in custody when a reasonable, innocent person would conclude that after brief questioning, he or she would not be freed to leave. When really the only thing the officer said was, hang on, as he went to talk to his supervisor, why doesn't that fit the language in Woneka that he was free to leave after brief questioning? Your Honor, we don't think that that phrase, hold on, told him that he was free to leave. If anything, we think that you have to look at the identity of the speaker, the person that told him to hold on, and the context of the situation. The police – it appears that first one officer arrived, Officer Chung Hoon, and shortly thereafter, two more officers arrived, Officer Araki and then the captain, Captain Dars. And the first police officer told Martin that he was there to investigate this gunshot. So this immediately told Mr. Martin, who the record shows appears to have been a reasonable person, and by the way, no criminal history. Ms. McMillan, before – this is Judge Noonan. It seems to me everything you say goes to show this was a question of fact, and I still don't know why Judge Morrow made a mistake on the facts. She made an error of law. She made an error of fact, Your Honor, in concluding that Mr. Martin was not in custody. Our position is that – That's a legal conclusion derived from looking at the facts. Your Honor, I guess I'm a little confused by the court's question. I believe that the judge had to come to certain factual conclusions to decide whether or not Mr. Martin was in custody. Do you think we're in a position to correct her on the facts? Yes, Your Honor. Under the clearly erroneous standard where the record is clear, that the lower court's conclusion is clearly erroneous and not plausible, and we don't think that it's plausible to have concluded that Mr. Martin was not under custody. Well, you know, I think I'm with you so far as this goes. That is, when the police officer says, hang on, I don't think a reasonable person thinks at that point that he's free to leave. But Judge Ikuta's question then comes up, which is to say, well, hang on for how long? Because if he's supposed to hang on just for a brief period for some questions, that doesn't sound under our case law as though it's custody, even though during that brief period he's not free to leave. Why should we think or conclude that he was supposed to hang on for such a long period that this amounted to custody? Well, the record doesn't say how long he was supposed to hang on for. Our position is that once the police arrived and told him to hang on, and they knew, he told them, that he was going to leave, that his ability to go about his business and his freedom to leave was now restrained, and he simply could not leave. Well, I understand that and I agree with you. The question is for how long. Until the police permitted him to leave, and the police eventually arrested him when they found the sawed-off shotgun in the gun cabinet. But when the officer said hang on, I think it was fairly implicit in the hang on, hang on, I've got to ask you a few questions, and depending on how these questions are answered, you may be quite free to leave. Your Honor, I don't know that from Mr. Martin's perspective he would have drawn that conclusion. I think he would, I think a reasonable person under those circumstances would have remained where he was until the police granted him permission to leave. Okay. Passing the custody question, because as you've said, and I think you're right on the general proposition of law, that if someone's in custody, we're more likely to find that there was no freely given permission, but someone can nonetheless be in custody and still give permission. Characterize, if you will, from your standpoint, what he said to the officer that allowed the officer to go into the house. Yes, the issue of the use of the pronoun we. Judge Mulway and the government make a big deal about this. They say that their position appears to be that when Mr. Martin, I'll back up a second, the police said they wanted to find this firearm that Mr. Martin fired into the air. And in response, Mr. Martin said, we have to go inside. And Judge Mulway and the government seem to think that somehow this is a voluntary invitation by Mr. Martin to go into the house to find this gun. And we just don't think that you can interpret it that way. This was a response by Mr. Martin, who was submitting to the authority of the police. He was acquiescing to the show of force on his property. And to think that somehow Mr. Martin could believe that he had, that he did not have to comply with this police request, I think defies common experience. And it's not a plausible interpretation of that response. Okay. You're just about just past a minute. Why don't we hear from the government and we'll make sure you have time to respond. Thank you, Your Honor. Good morning. My name is Michael Kawahara, Assistant United States Attorney representing the United States of America in this case. The standard of review on all issues before this Court is clear error. And the question is, was Judge Marwood clearly erroneous in her findings? The salient facts on both the consent issue and the custody issue. Well, there are no disputed facts here, really. That is to say, everybody seems to agree what happened. The question is, what's the legal consequence of the facts? Legal consequence, Your Honor, is that ‑‑ But if that's right, we're not talking about fact-finding. We're talking about what do these facts mean? These facts mean, Your Honor, that the defendant ‑‑ But that's a question of law. That's correct, Your Honor. But insofar as the question of a voluntary consent is concerned, that is a question of fact. Well, maybe, maybe not. There seems to be no dispute as to what was said and the order and so on. So there's no factual disagreement among the parties, as far as I can tell. Yes. As well as the finding by the Court that Officer Chun Hoon, the witness called, was credible. The salient factors, Your Honor, with respect to the consent issue. First, the defendant was never requested for consent to enter the house. All the officer said was, I need to recover the firearm. It was defendant who volunteered at that point, and I quote from officer's testimony, we need to go inside the house and get it. At which point, the defendant on his own went into the house. The officer followed him. Once inside the house, the defendant never said anything to the effect of, what are you doing here? You're not supposed to be in here. Instead, what defendant did was he went in the living room to a glass gun case. He pointed out the .30-30 lever action rifle, which he claimed he fired in the air. So everything that the defendant did, insofar as the question of consent, I would suggest the Court shows on his part that it was voluntary, because it was not directly solicited by the officer. It was the defendant himself who interpreted the officer's request, I need to recover the firearm, as meaning, come into my house and get it. I'll show it to you. And that's exactly what he did. What am I to make of the officer's statement, though, we have to recover the firearm? That doesn't sound as though that's optional language. We have to recover the firearm. That's correct. But the way he said that, he made no action, took no steps to actually do that. He made that point as a point of information to the defendant. And, as you know, under Hawaii law, because there was potentially a domestic dispute involved in here, he was authorized to do so, and he was acting under that authority. But in so doing, No, I have no dispute about that. It's quite clear that the officer was doing exactly as he was supposed to do in trying to recover it. But that makes it, in a sense, even more firm that when he says we have to recover the firearm, he's not doing what for him is an optional task. He said that, but the way he phrased that, Your Honor, did not mean, did not, you cannot imply in there saying that I have to go into your house, you have no choice in this matter. He just made that as a statement to the defendant of information. And it was the defendant who acted upon that and on his volition did the other matters. What's a reasonable person to say or think when an officer says hang on, which I take it to mean don't leave, and then the officer says we need to recover the firearm? Does that person then say, well, tough luck, where's your warrant? You could very well say that, Your Honor, but the other aspect to remember, too, is this occurred at the defendant's own residence. Correct. And he was not handcuffed, he was not restrained in any particular or any kind of way. That did not occur until after they recovered the sawed-off shotgun, which, of course, is an illegal firearm by itself. But no action, nothing coercive was taken up to that period of time. I think you can, it goes far to try and imply that just merely the officer saying or making a statement we have to recover the firearm means that he has to give up a whole panoply of rights. I think that's where the Miranda warning as a prophylactic measure comes in and was very helpful and important in this particular case, too. Because while, of course, the Miranda warning addresses Fifth Amendment concerns, by like token it also tells the defendant you do not have to cooperate with the police. And I think that was somewhat relevant and helpful with regard to Fourth Amendment. This is always hard because you're dealing with a legally unsophisticated person. I don't say that he's an unsophisticated man, but he's a legally unsophisticated man. But if he were legally sophisticated, he would say he's giving me a Miranda warning, he does not have to give me a Miranda warning unless I'm in custody. What does he think I am, in custody? No, I don't think you can imply that, Your Honor. But isn't that right, that a Miranda warning is not required unless he's in custody? That's correct. So a legally sophisticated person would have concluded the officer must think I'm in custody. I don't think so, Your Honor, because think of what the defendant did after that. Officer says, the defendant says we have to go inside the house together. And then on his own, without asking any permission of the officer, he proceeds right into his house. And I think that's important because that indicates that this defendant did not believe he was in any, in any way, shape, or form in custody, perhaps except to the extent you can't leave right now. But what the length of this detention, if at all, was a very short period of time. We're talking about a matter of minutes. Once inside the house, defendant was left alone after that. First of all, he was allowed to recover the keys to open the gun case to begin with inside the house. He was left inside the house on his own. I think everything that the officer did demonstrated to the defendant that he really was not forced or compelled to do anything. The officer was giving him the opportunity. He was given more than, say, he was required under the law. He was given a further penalty of rights, as indicated in the Miranda warning, and it was just for his information. But I don't think the defendant, from his own activities, from his own actions, did anything which would indicate that he was in any kind of custodial or coercive kind of status that would compel his consent or require him to acquiesce to what the officer was doing. And again, I reiterate, Your Honor, the officer never asked him for consent to enter the residence. Well, does that help or hurt your officer who never asked for consent? I think it doesn't. I think perhaps that would have been the officer's next question. But the defendant jumped over that and acted on his own. I don't think the only reason the officer said what he did was to inform the defendant of why and what he was doing and what he would be asking us. I think the officer was trying to be as helpful as he could under the circumstances, also taking into account officer safety issues, particularly because a firearm had been shot, particularly because the officer himself was not necessarily sure under the circumstances of, can I really believe what the defendant told me that he fired in the air? You don't really know at that point. What you're trying to do is to alleviate a potentially dangerous situation. So is it reasonable to think that had the officer said I need the gun and Mr. Martin says I'll go into the house and get it for you, that the officer would have allowed him to go by himself and bring out a gun? I think that would have been the situation at that point in time because that's basically what the officer was saying. He's saying that at that point in time he did not consider him to be under arrest. I'm putting myself in the position of the officer. He knows that there's been a report of a gunshot. He knows there's been some sort of a domestic altercation. And to follow up on Judge Yakuta's question, if Mr. Martin says I'm going to go into the house and get that, if I'm the officer, that's going to worry me. I'm not sure I want that man in that house all by himself to get a gun. I think I'm going with him. Yes, but that's where the importance of what the testimony was and the credible testimony of the officer was relied upon by Judge Mulway. According to the officer, Mr. Martin said we have to go inside the house and get it. We, not me, we. So it wasn't a question of the officer taking matters into his own hands. It was a matter of the defendant inviting the officer in to accompany him there. Such that once inside the house, Martin, on his own volition, could show that firearm to the officer. And that's exactly what happened in this case. Thank you. Any further questions from the bench? Nothing from me, Your Honor. Thank you. Ms. McMillan, you've got about a minute. Would you like to respond? Yes, very briefly, Your Honor. Your Honor, with all due respect to the government, our position is that it just defies common sense to say that a police officer's statement, we must recover the firearm, is just that, a statement. The statement that Mr. Martin could have responded to, well, tough luck, I'm out of here, or something of that nature. That Mr. Martin was in a position where he had to obey this command and retrieve this firearm. Also, this issue of what happened once they were inside, and the fact that the police left Mr. Martin alone in the house, apparently, according to the record, in front of his gun cabinet while Officer Chung Hoon went back out to talk to his captain. The government also makes a big deal about this. The government says that, well, he couldn't have been in custody if the police left him in front of the gun cabinet. We just don't think that you can reach that conclusion from this particular event. If anything, this just represents really dangerously poor police work. That's all, Your Honor. Okay. Thank you very much. Thanks, both sides, for your argument. The case, United States v. Martin, is now submitted for decision. The next case on the argument calendar this morning is Smith v. Plummer.
judges: Noonan, Fletcher, Ikuta